Appeal of GEORGE P. and BESSIE            Docket No. 288.
P. DOUGLAS.

1. A lessor taxpayer who kept his books and made his income-tax returns for 1918 and 1919 on a cash receipts and disbursements basis is not legally entitled to file amended returns showing income upon the basis of royalties which should have been paid to him by the lessee in accordance with the terms of the lease, but which, in fact, were not paid during the year when they became due and payment of which could not have been demanded by reason of an oral agreement between the lessor and the lessee.

2. Upon the evidence it is held that the taxpayer has not proven his claim to a greater deduction for depletion for the years 1918 and 1919 than has been allowed by the Commissioner.

3. Amounts paid for legal fees in connection with the settlement of an estate from which the taxpayer received his inheritance are not legally deductible from gross income.

4. Amounts paid to charitable and religious organizations are held to be deductible from gross income even though not claimed as such in the filing of an original return.

Submitted November 24, 1924; decided January 27, 1925.

*H. A. Mihills, C. P. A.*, for the taxpayer.

*A. Calder Mackay, Esq.* (Nelson T. Hartson, Solicitor of Internal Revenue) for the Commissioner.

Before GRAUPNER, LITTLETON, and SMITH.

This appeal came on for hearing on November 13 and November 17, 1924. Witnesses testified in behalf of the taxpayer and in behalf of the Commissioner. From the testimony and documentary evidence introduced the Board makes the following

FINDINGS OF FACT.

1. The taxpayers are husband and wife; are residents of Minneapolis, Minn., and for the calendar years 1918 and 1919 filed joint individual income tax returns.

2. A deficiency letter was mailed to the taxpayers on August 2, 1924, showing deficiences in tax as follows:

| | |
|---|---|
| 1918 | $16,588.90 |
| 1919 | 42,284.77 |
| | 58,873.67 |

3. The original income tax returns filed for 1918 and 1919 showed no tax due and no tax has been assessed upon them. They showed royalties received from mines as follows:

| | 1918 | 1919 |
|---|---|---|
| Pettit mine | $28,243.79 | $21,271.40 |
| Corsica mine | 75,145.69 | 201,152.60 |
| Chemung mine | 5,000.00 | 5,000.00 |
| Tioga mine | 3,000.00 | 3,000.00 |
| Emmett Mine (Roberts mine) | 6,577.98 | 3,813.84 |
| | 117,967.46 | 234,237.84 |

Deductions for depletion were claimed on the above returns in amounts equal to the royalties received from the respective mines.

4. The taxpayers kept their books of account for the years 1918 and 1919 on a cash receipts and disbursements basis and their income tax returns were made upon that basis.

5. The principal income of the taxpayers for the years 1918 and 1919 was from royalties received by Bessie P. Douglas as fee owner of an undivided one-half interest in the iron mines, above enumerated, located on the Mesaba Range in Minnesota. Her interest in the Pettit mine was acquired prior to 1913. Two-thirds of her interest in the other four mines was acquired by inheritance from her father, C. H. Pettit, who died on May 11, 1914, and the balance by deed from her mother, Deborah M. Pettit, during the year 1916.

6. The mines named were and long prior to 1913 had been under lease to certain iron ore operators who paid to the fee owners stipulated royalties on tons of ore mined in all cases with the exception of the Corsica mine. In lieu of a stipulated royalty per ton of ore mined from the Corsica mine the lessee paid 40 per cent of the net profits from operation under a so-called profit-sharing lease. This was entered into September 30, 1897, and provided in part as follows:

IV. In consideration of said lease, the party of the second part (the lessee) agrees to and with the said parties of the first part, that he will advance all moneys necessary for the said exploration and the development and operation of any mine or mines found upon said lands or any part thereof, including all necessary machinery, buildings, structures, fixtures, and the like, and that he will use his best endeavors to obtain money on the most advantageous terms for such purposes, and for the operation of such mine or mines.

And it is agreed that the second party shall keep a correct and strict account of all moneys received for sales of ore, and of all the proceeds of said mine or mines, or the disposition of any machinery, structure, or other property used in connection therewith, and that for all moneys so advanced and expended by said second party, as aforesaid, for such explorations, and for buildings, structures, fixtures, and other improvements constituting the "plant" of said second party or assigns, for said mining operations, he or they shall be allowed for and repaid out of the gross earnings or proceeds of said mines, sales, or mining operations; but only twenty (20) per cent of said expenditures shall be allowed and charged up against said gross earnings in any one year.

And it is also agreed that said second party shall be allowed interest at the rate of six per cent (6%) per annum on all amounts or balances for such expenditures remaining unpaid, which interest may be charged up annually against the gross earnings or profits of said mine or mines. All such expenditures shall be prudently and economically made and for the best interests of all the parties to this agreement.

It is expressly understood and agreed that the parties of the first part shall not be subject either directly or indirectly to any liability whatever in the premises for any obligation, debt, contract, or undertaking assumed or made by the party of the second part or his assigns, in any manner connected with said mining operations.

V. It is further mutually agreed that there shall be paid to the said first parties, their legal representatives or assigns, by the said second party, his legal representative or assigns, as in the nature of royalty, each and every year during the continuance of this lease, a sum equivalent to forty per cent (40%) of the net profits of the sales and proceeds of said mines or mining operations for such year, after deducting the sum or sums herein allowed to be charged off and deducted from the amount of the gross earnings and sales for such year. And that their proportion of said net profits shall be advanced to them, said first parties, pro rata with any amount or amounts thereof received or appropriated by the said second party or his assigns, and all account of the mining operations for each year shall be made and rendered on the first day of December of such year, during the continuance of this lease; and said forty per cent (40%) of the net profits of each year's business shall be paid to said first parties on or before December 20th of such year. Each business year under this agreement shall end with November 30th.

And the party of the second part shall, upon the said first day of December of each year, make and transmit to the said first parties an exact and truthful statement of the business for the year ending with said 30th day of November, and of the amount of iron removed and sold during said year.

\*          \*          \*          \*          \*          \*          \*

It is by the said parties hereby mutually understood and agreed, that if the said party of the second part shall fail to render his account of the operation of said mine, as aforesaid, on the first day of December of each year, or within twenty (20) days thereafter, or if the said second party shall fail to pay over to said first parties their proportion of the said net profits as herein provided, and the same shall remain in default for the period of sixty (60) days. or if the said second party shall fail to keep and perform any of the promises, covenants, or conditions herein expressed, to be by them kept and performed, then said first parties, their representatives and assigns shall have the right to terminate this lease and agreement at any time, by posting a written notice of termination in a conspicuous place at the mine or mines on said land, \* \* \*.

VI. And it is agreed that the said parties of the first part shall be entitled to have, own, and possess an undivided four-tenths (4/10) interest in all improvements, structures, buildings, fixtures, appliances, and equipments so to be erected, placed, and made on said lands or any part thereof, during said term, as soon as and to the extent that the same shall be paid for out of the said gross earnings and sales.

7. Although the Corsica mine lease contained a covenant providing that 40 per cent of the net profits of each year's business shall be paid to the lessors on or before December 20 of each year it proved impracticable for the lessee to live up to this covenant. The taxpayers

" purely for the use and the benefit of the Pickands-Mather Company (lessee) \* \* \* allowed them to hold the payments until January of the succeeding year, for their convenience only. \* \* \* They settled with the Lackawanna Steel, and they said their books were all closed on December 31st, but they did not always get their payments until some time in January, and therefore we agreed that they should pay us as they got them in January. In fact I have run over into February before we got our payments." (Testimony of George P. Douglas.)

8. On January 1, 1919, the lease of the Corsica mine made in 1897 was canceled and a new lease entered into under the terms of which the taxpayers received a stipulated royalty as in the case of the four other mines. Under the new lease the taxpayers received their royalties quarterly.

9. During the year 1919 the taxpayers received a total of $201,-152.60 in royalties from the Corsica mine. Of this amount $91,099.07 was received in February, 1919, and represented the taxpayers' portion of the profits from the operation of the mine (in lieu of royalties) under the lease which was canceled as of December 31, 1918; the balance of the amount, $110,053.53, represented royalties upon ore mined during the calendar year 1919.

10. The amounts of depletion claimed as deductions from gross income in the taxpayers' original tax returns for 1918 and 1919 were $117,967.46 and $234,237.84, respectively. Upon an audit of the returns by the Commissioner, the amounts allowed for depletion for the years 1918 and 1919 were $56,744.92 and $98,653.60, respectively. If the taxpayers had been allowed the same depletion unit which was allowed another taxpayer who owned an undivided one-sixth interest in the same mines, the amount of depletion which would have been allowed the taxpayers as deductions for the years 1918 and 1919 would have been $58,615.32 and $100,339.35, respectively.

11. The cancellation of the old lease of the Corsica mine was in consideration of the payment by the lessee to the fee owners of $30,244.92. Under the old lease the fee owners had a 40 per cent interest in the improvements made by the lessee, the cost of which improvements was treated by the lessee as an expense of operation. The taxpayers received during the calendar year 1919, $15,122.46, representing their share of the amount paid by the lessee to the fee owners in 1919 for the fee owners' interest in the improvements which had been placed upon the property from the beginning of the term of the lease, 1897 to December 31, 1918. The taxpayers did not return any portion of this $15,122.46 as income for 1919, upon the theory that it was a return to them of capital. The taxpayers contended before the Commissioner that they sustained a loss upon the transaction. This claim, however, was abandoned.

12. During the year 1918, Bessie P. Douglas paid to her attorneys a balance due them for services rendered in connection with litigation which resulted in the breaking of her father's will, $26,500. The amount was not claimed as a deduction from gross income in the original joint individual income tax return filed for 1918.

13. The taxpayers deducted from gross income for charitable contributions in their original return for the year 1918 the sum of $802.55. The charitable contributions made during the year by the taxpayers were as follows:

| | |
|---|---:|
| Y. M. C. A. & Y. W. C. A. war fund | $800.00 |
| American Red Cross | 1,150.00 |
| Y. M. C. A. building fund | 600.02 |
| Y. W. C. A | 50.00 |
| French orphans | 73.00 |
| Seton Guild | 25.00 |
| Westminster Presbyterian Church | 250.00 |
| Bethany Home Association | 25.00 |
| Boy Scouts | 50.00 |
| Salvation Army | 50.00 |
| Infant Welfare Society | 100.00 |
| Jewish War Relief | 25.00 |
| Women's Council of National Defense | 25.00 |
| Women's Missionary Society | 25.00 |
| Sunshine Society | 8.00 |
| Total | 3,256.02 |

### DECISION.

The deficiency in tax should be computed in accordance with the following opinion. Final decision of the Board will be settled on consent or on seven days' notice in accordance with Rule 50.

### OPINION.

SMITH: The taxpayers assign as errors on the part of the Commissioner in the determination of tax liability for the years 1918 and 1919 the following:

1. The basis of allocation of income from the Corsica mine is incorrect.

2. The amount of depletion allowed by the Commissioner for each of the years 1918 and 1919 is incorrect.

3. The taxpayers' deductions for the year 1918 should include, in addition to those allowed by the Commissioner, the amount of $26,500 paid for legal services during that year.

4. The taxpayers' deduction for contributions for the year 1918 should be $3,260.02 instead of $802.55 reported on the original return.

In his amended answer the Commissioner contends that an error was made in the amendment of the 1919 return in failing to include in gross income $15,122.46 actually received by the taxpayers during that year and not returned by them.

The contentions of the taxpayers and of the Commissioner will be considered in order.

(1) In their joint returns for the years 1918 and 1919 the taxpayers reported income consisting in large part of royalties received from five mines. The major part of the royalties received during each year was from operations of the Corsica Mine. The amounts received from this mine for the years 1918 and 1919 were $75,145.69 and $201,152.60, respectively. The amount received in 1918 represents the taxpayers' portion of the profits arising from the operation of the Corsica Mine for the period December 1, 1916, to November 30, 1917. Under the lease agreement then in effect this amount was payable by the lessee on December 20, 1917, but the lessee had 60 days additional within which to make payment without being liable for any breach of the covenants of the lease and by agreement with the fee owners payment of these profits to them was uniformly made more than 31 days after the close of the lessee's taxable year (November 30). The lease under which the taxpayers received their income for the year 1918 was abrogated as of January 1, 1919, and thereafter the taxpayers received royalties at stipulated rates per ton of ore produced, the royalties being payable on the 20th day of January, April, July, and October of each year for the three months preceding the first day of each of the months named. Under this arrangement the taxpayers, during the year 1919, received royalties under the old lease for the period December 1, 1917, to December 31, 1918, and under the new lease from that date to September 30, 1919. The books of account of the taxpayers show cash receipts and disbursements and the amount of such receipts shown for the year 1919 was large. The taxpayers contend that under the old lease the royalties were *constructively* received on the 20th day of December and that the royalties from the Corsica Mine which were reported for the year 1918 should have been reported for the year 1917; also that such portion of the royalties received in 1919 as were upon the production of the Corsica Mine for the year 1918 ($91,099.07) should have been returned as income for 1918 and that the amount returnable for the year 1919 was only such portion of the royalties received in 1919 as resulted from operations of the mine during that year ($110,053.53). The taxpayers contend for the right to report royalties strictly in accordance with the lease agreements, or as outlined by the lease agreements themselves. The taxpayers have prepared amended returns going back to the year 1913, in which they have reported the royalties from the Corsica Mine in this manner. The taxpayers contend that returns upon this basis are warranted by Article 54 of Regutions 45 (1920 edition).

The Commissioner has refused to accept the amended returns as reflecting the taxable net income.

The Board is of the opinion that the taxpayers have no such case as is contemplated by Article 54 of Regulations 45 (1920 edition). The taxpayers have furnished no proof that they could have demanded and received in the year 1918 any portion of the royalties that were paid to them in the year 1919. The lessee of the Corsica Mine was not bound by the lease which was in force to January 1, 1919, to pay over any portion of the profits to the fee owners during the calendar year within which the lessee's fiscal year ended. The lessee had 60 days of grace in which to make the payment. It is furthermore to be noted that Mr. Douglas testified that the taxpayers had agreed with the lessee that the royalties might be paid in January or February following the close of the lessee's taxable year. The contention of the taxpayer upon this point must be and is denied.

(2) The second point relates to the amount of depletion to which the taxpayers as owners of an undivided one-half interest in the fee of mine properties are entitled for the years 1918 and 1919. The Commissioner has allowed depletion of $56,744.92 for 1918 and $98,-653.60 for 1919. The taxpayers claim that if they had been allowed depletion at the same rates as were used in the determination of the allowable depletion in the case of one of the other fee owners (Charles H. Robinson) the amounts allowable would be $58,615.32 for 1918 and $100,339.35 for 1919. The Commissioner contends that the depletion allowance arrived at in the case of Mr. Robinson was on a compromise agreement, namely, that the taxpayer should file amended returns for all of the years 1913 to 1919, inclusive, and that the depletion was allowed solely upon that basis. The taxpayers assert that they have also offered to file amended returns for the years 1913 to 1919, inclusive, but the Commissioner denies that the amended returns which have been prepared are upon a proper basis, that basis being neither a cash receipts and disbursements basis nor an accrual basis. A further point made by the Commissioner is that the taxpayers did not own an undivided one-half interest in any of the mines except the Pettit Mine on March 1, 1913, and that no depletion rate has been determined for any date other than March 1, 1913.

The depletion unit to which the taxpayers are entitled for all of the mines, except the Pettit Mine, must be computed at a different basic date from that used in the determination of the depletion unit for Mr. Robinson. The only depletion unit which has been computed has reference to the date March 1, 1913. The taxpayers, however, did not own any interest in any of the mines except the Pettit Mine on March 1, 1913. Their only interest was acquired at a considerably later date. The taxpayers have furnished no evidence which would enable the Board to compute the correct depletion unit for a later date, and consequently the Board is unable to determine whether the depletion unit fixed by the Commissioner is improper. The appeal of the taxpayer upon this point must therefore be denied for lack evidence.

(3) For the year 1918, the taxpayers allege that they failed to deduct from gross income in their joint tax return $26,500 repre-

senting attorneys' fees paid for legal services rendered which resulted in the breaking of the will of Mr. C. H. Pettit, the father of Bessie P. Douglas, who died May 11, 1914. It is now contended that the taxpayers failed to claim these deductions for the reason that the original returns showed no taxable income and that therefore it was unnecessary to claim all of the deductions to which the taxpayers were entitled.

Section 214 (a) (1) of the Revenue Act of 1918 permits individuals to deduct from gross income in their annual tax returns "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *."

Legal expenses incurred in breaking a will by which a taxpayer comes into possession of his inheritance are not expenses incurred in carrying on a trade or business. The appeal of the taxpayer upon this point is denied.

(4) In their original joint income-tax return for 1918, the taxpayers deducted from gross income on account of contributions made to charitable and religious organizations, $802.55. It is found that the amount paid to such organizations was $3,256.02.

The Board is of the opinion that the taxpayers have proven their right to a deduction from their gross income for the year 1918 of $3,256.02, representing amounts paid to charitable and religious organizations and that in the computation of their true tax liability for the year 1918 this amount should be allowed as a deduction from the gross income. The appeal upon this point is allowed.

(5) In their original return for the year 1919, the taxpayers failed to report as income $15,122.46, which they received from the lessee of the Corsica Mine for their interest in certain improvements which had been made upon the leased premises by the lessee. The taxpayers claimed that they sustained a loss upon this transaction on the abrogation of the old lease but this claim for loss was withdrawn at a hearing before the Commissioner and there was no finding by the Commissioner that the amount received by the fee owners was in excess of the March 1, 1913, value of the share of the improvements belonging to the fee owners. In view of this fact, the Board is of the opinion that there is no evidence before it which warrants a finding that the taxpayers derived any income from the transaction. The contention of the Commissioner upon this point is therefore denied.